```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MINNESOTA

----------------------------------------------------------------
                              )   COURT FILE
UNITED STATES of AMERICA      )   NO. 15-CR-235 (JNE/TNL)
                              )
         vs.                  )
                              )   Courtroom 13 West
(7) ALBERT DONELL PAYNE       )   Tuesday, March 22, 2016
                              )   Minneapolis, Minnesota
----------------------------------------------------------------
```

**S E N T E N C I N G**

BEFORE THE HONORABLE JOAN N. ERICKSEN
UNITED STATES DISTRICT JUDGE

**A P P E A R A N C E S:**

For the Government:   **OFFICE OF THE U.S. ATTORNEY**
                      By:  THOMAS M. HOLLENHORST
                           Assistant U.S. Attorney
                      600 United States Courthouse
                      300 South Fourth Street
                      Minneapolis, Minnesota  55415


For the Defendant:    **FLANAGAN LAW OFFICE**
                      By:  PATRICK W. FLANAGAN, ESQUIRE
                      5669 - 147th Street North
                      Post Office Box 167
                      Hugo, Minnesota  55038


Court Reporter:       **TIMOTHY J. WILLETTE, RDR, CRR, CRC**
                      Official Court Reporter - U.S.D.C.
                      1005 United States Courthouse
                      300 South Fourth Street
                      Minneapolis, Minnesota  55415
                      612.664.5108

1    (2:00 p.m.)

2             **P R O C E E D I N G S**

3                **IN OPEN COURT**

4    (Defendant present)

5         THE COURT:  Good afternoon, everyone.  Please be

6    seated.

7             This is United States vs. Albert Payne, before the

8    Court for sentencing pursuant to a guilty plea to a charge

9    of conspiracy to distribute heroin.

10            Counsel, would you identify yourselves for the

11   record.

12            MR. HOLLENHORST:  Good afternoon, Your Honor.  Tom

13   Hollenhorst for the United States.

14            MR. FLANAGAN:  Good afternoon, Your Honor.

15   Patrick Flanagan on behalf of Mr. Payne, who is present.

16            THE COURT:  Good afternoon to you both.

17            Let's first address the calculations contained in

18   the presentence investigation report.

19            The calculations result in a guideline range that

20   is the same as was contemplated in the plea agreement, so

21   we're talking about 60 months to 71 months, and that is with

22   a Total Offense Level of 21, Criminal History Category of

23   IV.  There is, of course, the 60-month mandatory minimum.

24            Mr. Hollenhorst, anything from the Government with

25   respect to the factual assertions or calculations contained

1    in the PSI?

2             MR. HOLLENHORST:  No, Your Honor.

3             THE COURT:  And Mr. Flanagan?

4             MR. FLANAGAN:  Only those I've already addressed,
5    Your Honor, in my submissions, and no further argument.

6             THE COURT:  Okay.  I adopt the calculations
7    contained in the presentence investigation report.  I've
8    already indicated that those guidelines call for a sentence
9    of between 60 and 71 months and a supervised release term of
10   between four and five years, a fine of between $7,500 and
11   $5 million, and of course there must be a $100 special
12   assessment.  Restitution would be mandated if there were an
13   identifiable victim, which there is not in this case, and so
14   the restitution is not going to be a financial consequence.

15            Very well.  With those as the advisory ranges,
16   Mr. Hollenhorst, anything for the Government?

17            MR. HOLLENHORST:  Your Honor, before saying
18   anything, we have in the courtroom today Ms. Jennifer
19   Nordeen and her husband.  Ms. Nordeen's only son was
20   tragically killed last January 2015 in a heroin overdose.
21   She'd like to say a few words to the Court.

22            THE COURT:  If she is somehow a victim of this
23   offense, I can hear from her pursuant to the rule, otherwise
24   not, but I guess while she's here, let's find out from her.
25   The rules --

1               MS. NORDEEN:  This is not bad.
2               THE COURT:  Well, it doesn't matter whether it's
3    bad or not.  The rules provide that a victim of an offense
4    has a right to be heard in court and you are a victim of
5    this offense, is that true?  I'm happy to hear whatever you
6    have to say.
7               MS. NORDEEN:  My son --
8               THE COURT:  No, you need to only look at me.  Do
9    not look at anybody else.  Face forward.
10              MS. NORDEEN:  My son, Dylan Pearson, died of an
11   overdose January 31st, 2015, and I guess this case was not
12   directly linked to -- I'm not sure, actually, so I don't
13   know what more I can say, actually, at this point.
14              But I do want to say he was my only child and I do
15   forgive -- forgive everybody who was involved.  And I hope
16   that when they get out they can live a normal life and
17   everything, that their kids can grow up and not have to deal
18   with the same stuff we've had to deal with.  Because I
19   understand that they probably got in the same predicament,
20   the addiction, the money.  This is an addiction as well,
21   because that's the way I look at it.  And sadly enough my
22   only child had to die from it, but I do hope that after he
23   gets out in five, seven, however long it is, that he can
24   live --
25              THE COURT:  Can I ask you a question?

1           MS. NORDEEN:  Certainly.

2           THE COURT:  This is a very -- emotional is an
3    understatement for what you're going through, but in order
4    to put it into the context that we're here for today, may I
5    ask you, was someone identified as the individual who gave
6    your son the heroin?  Has somebody been charged with that?

7           MS. NORDEEN:  Not charged, no.

8           THE COURT:  Is there some hope that they might be
9    charged?

10          MS. NORDEEN:  Yes.

11          THE COURT:  So at that point then you are a victim
12   of that crime and that person's guideline range is going to
13   be very long.

14          So just to inject some dry law into what is an
15   emotional situation for you, the job of a sentencing judge
16   is to sentence the person before them for the crime for
17   which they've been convicted.

18          MS. NORDEEN:  Right.

19          THE COURT:  And the statute and the rules provide
20   for hearing from victims of that offense, and that's from
21   the Government's side.

22          And the reason the rules say that is that
23   otherwise you can have problems on appeal, because it might
24   seem like somebody's being sentenced for something that
25   they're not actually convicted of, and that runs counter to

1   the entire -- the structure of the American criminal justice
2   system.
3           So I won't go on and on about it, because there's
4   such a dissonance between the dry legal concepts that I'm
5   explaining and the heartrending tragedy that you're speaking
6   of, but I'm going to -- as a human being, I appreciate what
7   you're saying, but in terms of this hearing, I'm going to
8   have to disregard it.
9           MS. NORDEEN:  That's fine.  That's okay.
10          THE COURT:  Okay.  Thank you.
11          MS. NORDEEN:  Thank you.
12          THE COURT:  Mr. Hollenhorst.
13          MR. HOLLENHORST:  Your Honor, this is a case
14  that's driven more by mandatory minimums than the
15  guidelines.  Of course, the offense is very serious and
16  that's why there's a five-year mandatory minimum in this
17  case.
18          The defendant came in, he admitted his mistakes,
19  he's done what he needed to do to resolve his life.  We only
20  hope that he can -- as Ms. Nordeen just said, I hope he can
21  come back and live a productive life.  We ask for a sentence
22  within the range, Your Honor.
23          THE COURT:  Thank you, Mr. Hollenhorst.
24          Mr. Flanagan?
25          MR. FLANAGAN:  Thank you, Your Honor.

1           We also ask that the Court sentence at the
2   60-month guideline -- mandatory minimum.
3           My client does want the Court to know and
4   everybody else to know that there has been -- and I have
5   seen it -- a transformation over the past eight months of
6   him being locked up.  When he and I first met, he had that
7   hard mentality, not trusting me, not trusting anybody I was
8   with.  That's part of the reason I --
9           THE COURT:  Is that because you're Irish?
10          MR. FLANAGAN:  Could be.  That also could be.  But
11  I also brought in Mr. Frank Applewhite-Bey to help out with
12  those communications.
13      (Mr. Applewhite-Bey stands and is then reseated)
14          MR. FLANAGAN:  And from that point on, we began to
15  notice something completely different.
16          When that hard exterior came through, we started
17  noting a lot of swings up and down, both happy and sad.  And
18  to the point of when he thought it was to the point where
19  there was no way out and the weight of the world was on his
20  shoulders, his entire body language just shut down.  He
21  tilted his head, he slid down in his chair, he quit
22  listening to anything we had to say.  I think that even
23  happened during the PSR at one point in time and we kind of
24  had to take a break and get him back to listening to what
25  the questions were, because he was taking them to the -- it

1  was all over with.
2           And through that PSR and through our -- more since
3  the PSR, actually, we learned that Albert's father was
4  really never in the picture.  He grew up on the hard side of
5  the south side of Chicago where the neighborhoods kind of
6  ran the street.  And his mother, who kept everybody together
7  and got his brothers and sisters -- those brothers and
8  sisters who are very successful, have jobs, have kids, have
9  families, live a very productive life, she died when he was
10 at the age of 11, and he was just kind of off on his own.
11 And the streets kind of raised him, because his brother, who
12 was 27 at the time, who he went to live with, had a
13 full-time job and family and actually worked two jobs to try
14 to support his family and was really never around for
15 Albert.  He joined --
16           THE COURT:  I'm just --
17           MR. FLANAGAN:  Oh, okay.  I thought --
18           THE COURT:  -- amazed.  I'm just thinking about
19 my -- I was actually wondering whether I should tell you
20 this, but now that I've started down this road, my father
21 grew up on the south side of Chicago.  But anyway, that's --
22 I was not going to say that.  I accidentally took a breath.
23           MR. FLANAGAN:  No, I apologize.  I thought maybe I
24 had said something that you wanted to interject on.
25           So he allowed this kind of structure to develop

1   his life and that's what he knew and that's what was easy
2   for him and that's what he went back to.
3              As he began to open up, he started talking about
4   how much he actually liked being up here in Minnesota,
5   because he was away from all of that chaos and away from
6   that constant gun battle and away from the constant sirens,
7   and what can you do just to make it today and stay out of
8   everybody's eye.
9              He began looking at -- we mentioned that he began
10  looking at education, began looking at these other things,
11  but he never really knew how to go about doing it.
12             Since the PSR, since Mr. Applewhite-Bey and I have
13  been talking to him more -- and Mr. Applewhite-Bey actually
14  had some personal experience, so he provided that to
15  Mr. Payne, about how well U.S. Probation can help out and
16  how they can help him and assist him.
17             And Mr. Payne has already kind of laid out a plan
18  for himself.  He was a little frustrated to learn that the
19  Chicago -- that the prison system in Chicago lost his GED
20  transcripts.  We sent those specific requests down to them.
21  They confirmed both in a letter to me and to
22  Mr. Applewhite-Bey that my client did in fact complete the
23  early termination program, allowing him out of prison when
24  he did do prison before, which would mean that he probably
25  did do the GED program, because that was part of the

1  requirement to earn that, but they don't have any records of
2  his GED, so he's going to have to redo that.
3            Had we learned that earlier, Mr. Payne would
4  probably be in here today with his GED program that he would
5  have earned up in Sherburne over the past seven months,
6  because I think in speaking with him, how articulate he is
7  and how well he's able to speak and reason things, I think
8  he probably would have passed out of most of those and just
9  had to focus on a few sections.
10           With all of that, he plans on getting his GED
11 immediately.  From there he's already looking into and has
12 already researched on his computer time that they allow him
13 becoming a welder.  He wants to get into a trade and welding
14 seems to be the one that he thinks fits with him working
15 with his hands as well as being artistic.
16           So, Your Honor, I think he has a good plan going
17 forward and I'd ask the Court to sentence him to that
18 mandatory minimum of 60 months, at least make a
19 recommendation to any drug programs that may be available to
20 him.  He may or may not qualify, but at least the
21 recommendation would help out if he does qualify.
22           He does not want -- despite having family in
23 Illinois and around there, he does not want me to request a
24 facility in either Michigan, Indiana, or Illinois.  He would
25 ask for a facility here.  He actually asked if I could

|   |   |
|---|---|
| 1 | request Hawaii so he could get as far away from everybody as |
| 2 | possible.  I told him that probably everybody wants to go to |
| 3 | Hawaii, but I will let the judge know that.  But he would |
| 4 | ask for a request here in Minnesota as well as that RDAP |
| 5 | program -- |
| 6 | THE COURT:  Alaska?  That's pretty far away. |
| 7 | MR. FLANAGAN:  That might be a little too cold for |
| 8 | him.  I don't think he'd want to do that. |
| 9 | THE DEFENDANT:  (Shaking head). |
| 10 | MR. FLANAGAN:  But, Your Honor -- |
| 11 | THE COURT:  Let's hear from him, shall we? |
| 12 | MR. FLANAGAN:  We will, Your Honor. |
| 13 | The only other thing that I'd mention too is that |
| 14 | I'm not a psychologist, but I think if there's any mental |
| 15 | health programming in a facility, that might help him, |
| 16 | because I think there are some unresolved -- he's never |
| 17 | dealt with the loss of his mother and I think that some of |
| 18 | that may help him get past at least some confidence issues |
| 19 | so he can move forward. |
| 20 | THE COURT:  I was going to ask you about that. |
| 21 | The mood differences that you perceived in interviewing him, |
| 22 | that doesn't require a psych eval in your opinion, does it? |
| 23 | MR. FLANAGAN:  No, it never got to that.  It was |
| 24 | more of a situation that it was just a complete shutdown and |
| 25 | kind of slumping down and just someone who looked very |

1  depressed when he thought that there was no way out, and
2  then we kind of had to build him back up and say, "No, there
3  are these other possibilities."
4        THE COURT:  Okay.  He seemed very I guess with the
5  program and intelligent when I was having that long
6  conversation with him at the guilty plea.
7        MR. FLANAGAN:  And he is, Your Honor.  I think
8  he's very smart and very articulate.
9        THE COURT:  Well, Mr. Payne, come on up to the
10 podium with your lawyer.
11       (Defendant approaches lectern)
12       THE COURT:  How are you?
13       THE DEFENDANT:  I'm all right.
14       THE COURT:  Well, you've heard the lawyers.
15       THE DEFENDANT:  Yes.
16       THE COURT:  And now you have a chance to say
17 anything that you might want to say before I sentence you.
18 Anything you want to say?
19       THE DEFENDANT:  I just (indicating) -- just seeing
20 my child and her mother cry, with all my situation and
21 everything, you know, I just feel her pain.  That's about
22 all I got to say.
23       THE COURT:  Well, of course, heroin is a dangerous
24 drug, which is why it's illegal and why the guidelines are
25 as high as they are.

1           So we talked quite a bit when you pled guilty and
2   so you've had plenty of time to talk to Mr. Flanagan before
3   the sentencing, I gather.
4           THE DEFENDANT:  Yes.
5           THE COURT:  Okay.  So anything else that you want
6   to say on your own behalf?
7           THE DEFENDANT:  Earlier I had so much to say.
8   Right now my mind is congested and I should have wrote it
9   down.
10          THE COURT:  Do you have supporters of yourself in
11  court here today?
12          MR. FLANAGAN:  He does, Your Honor.  He's got his
13  girlfriend with his new baby.  So I think that's part of the
14  reason I know when -- I can tell the Court when we had
15  discussed at the initial phases of this case and the loss of
16  those other children involving this drug, that kind of
17  weighed on his mind, because he's beginning to think about:
18  Well, my baby's out here, and at some point in time -- he's
19  already talked to me about he's going to be three or four
20  steps ahead of her.  He's going to know what's going on
21  using his own personal experiences to try to help out to
22  make sure she doesn't go down the same path he did.
23          THE COURT:  Mr. Payne, you do seem and have always
24  seemed to me to be a person has a lot of potential, so it's
25  my great hope that some of that potential comes to fruition

1   once you are out of the institution and even while you're in
2   it.
3           I am going to sentence you to 60 months in the
4   custody of the Bureau of Prisons and then you'll be on
5   supervised release for three years after that.  And remember
6   when you pled guilty we talked about how important it is to
7   comply with the conditions of supervised release, because if
8   you violate, then you come back and I have to send you back
9   to prison.
10          THE DEFENDANT:  Yes.
11          THE COURT:  The conditions are that you report to
12  the U.S. Probation and Pretrial Services Office in the
13  district where you are released -- and we'll get to the
14  recommendation of where in a minute -- but in the district
15  where you're released within 72 hours of release from
16  custody of the Bureau of Prisons.
17          You must not commit any crimes.  That's federal,
18  state, or local crimes.
19          You must not illegally possess a controlled
20  substance.
21          You must refrain from any unlawful use of a
22  controlled substance, submit to one drug test within 15 days
23  of release from imprisonment and at least two periodic drug
24  tests thereafter as determined by the Court.
25          You must not possess a firearm, ammunition,

1  destructive device, or other dangerous weapon.
2           You have to cooperate in the collection of DNA as
3  directed by the probation officer.
4           You have to abide by the standard conditions of
5  supervised release that have been adopted by the Court,
6  including the following special conditions.
7           Abstain from the use of alcohol and other
8  intoxicants.  That makes sense to you, right?
9           THE DEFENDANT:  Yes, ma'am.
10          THE COURT:  Okay.  And do not frequent
11 establishments whose primary business is the sale of
12 alcoholic beverages.
13          You are to complete an immediate assessment or
14 participate in a program for substance abuse as approved by
15 the probation officer upon release or relapse during your
16 term of supervised release.
17          The program may include testing and inpatient or
18 outpatient treatment, counseling, or a support group, and
19 you are to contribute to the costs of that treatment as
20 determined by the Co-Payment Program that the Probation
21 Office has, not to exceed the total cost of treatment.
22 That's an as-much-as-you-can-afford program.
23          You must not associate with any member, prospect,
24 or associate member of the Commando Boys or Chicago Crew
25 gang or group, or any other gang, unless you are granted

1   permission to do so by the probation officer.  And you must
2   not wear or possess any article of clothing, including hats,
3   insignia, emblems, anything else, that might signify
4   affiliation with or membership in either of those gangs or
5   any other gang.
6           You have to submit your person, residence, office,
7   vehicle, or an area under your control to a search conducted
8   by a U.S. Probation Officer or supervised designee, at a
9   reasonable time and in a reasonable manner, based on
10  reasonable suspicion of contraband or evidence of a
11  supervision violation.  And you have to warn any other
12  residents or third parties that the premises and areas under
13  your control may be subject to searches pursuant to this
14  condition.
15          If you are not employed at a regular lawful
16  occupation as deemed appropriate by the probation officer,
17  you may be required to perform up to 20 hours of community
18  service per week until you are employed, and also to
19  participate in counseling, daily job searches, or other
20  employment-related activities as directed by the probation
21  officer.
22          If they can't locate your GED and you don't have
23  it by the time you get out, then it is a condition that you
24  participate in educational programming as approved by the
25  probation officer to get your high school diploma or General

1   Equivalency Diploma.

2            Just as an aside, I can't imagine how frustrating
3   that must be to go to all that work and then have them lose
4   it.  I wouldn't want be incarcerated there either if they
5   lost my stuff.

6            And then lastly, you have to participate in a
7   psychological or psychiatric counseling or treatment program
8   as approved by the probation officer and contribute to the
9   costs of that treatment as determined by the Probation
10  Office Co-Payment Program, not to exceed the total cost of
11  treatment.

12           So those are the conditions of supervised release.
13  You do have to pay a $100 special assessment for the Crime
14  Victims Fund.  That's due and payable immediately.

15           Now, the rules of the Court of Appeals provide
16  that any appeal would have to be noticed within 14 days of
17  today's date.  People who wish to have an appeal and an
18  attorney on their appeal and can't afford one are entitled
19  to have one represent them at no cost.

20           Your lawyer tells me that you would like a
21  recommendation for the Residential Drug Abuse Program, the
22  RDAP program.  The Bureau of Prisons has such a program and
23  it seems to me that that would be a good program for you to
24  participate in, so my recommendation will go with you.

25           THE DEFENDANT:  Thank you.

1    THE COURT: Your lawyer tells me that you would
2    like a recommendation for an institution in or near the
3    state of Minnesota. Is that your wish?
4    THE DEFENDANT: Yes.
5    THE COURT: And you know that that's a Bureau of
6    Prisons decision. They can't have judges all over the
7    country saying, "I want this person here and that person
8    there," but at least when they consider their whole basket
9    of factors, one of the things that they consider is the
10   judge's recommendation, so I will recommend Minnesota or as
11   close thereto as possible.
12            Other counts to be dismissed?
13   MR. HOLLENHORST: Yes, Your Honor. The Government
14   moves to dismiss Counts 5, 6, 14, 17, and 18.
15   THE COURT: So ordered.
16            I believe that's everything. Mr. Flanagan,
17   anything else?
18   MR. FLANAGAN: Nothing further, Your Honor.
19   THE COURT: Thank you for your courtesy, sir.
20            Mr. Hollenhorst, anything else for the Government?
21   MR. HOLLENHORST: No, Your Honor.
22   THE COURT: Okay. Mr. Payne?
23   THE DEFENDANT: No. Thank you.
24   THE COURT: Good luck to you.
25            We're in recess.

```
 1              (Proceedings concluded at 2:33 p.m.)
 2                       *     *     *     *
 3
 4
 5
 6
 7                    C E R T I F I C A T E
 8
 9
10       I, TIMOTHY J. WILLETTE, Official Court Reporter
11       for the United States District Court, do hereby
12       certify that the foregoing pages are a true and
13       accurate transcription of my shorthand notes,
14       taken in the aforementioned matter, to the best
15       of my skill and ability.
16
17
18                      /s/ Timothy J. Willette
19
20              TIMOTHY J. WILLETTE, RDR, CRR, CRC
            Official Court Reporter - U.S. District Court
21                  1005 United States Courthouse
                      300 South Fourth Street
22               Minneapolis, Minnesota  55415-2247
                          612.664.5108
23
24
25
```